IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

EASTERDAY DAIRY, LLC, a Washington
limited liability company; and
COLE EASTERDAY,

        Plaintiffs,

    v.

FALL LINE CAPITAL, LLC, a Delaware
limited liability company; CANYON FARM,
LLC, a Delaware limited liability company; and
CANYON FARM II, LLC, a Delaware limited
liability company,

        Defendants.

and

CANYON FARM, LLC, a Delaware limited
liability company; and CANYON FARM II,
LLC, a Delaware limited liability company,

        Third-Party Plaintiffs,

    v.

Case No. 2:22-cv-01000-HL

**OPINION & ORDER**

PAGE 1 – OPINION & ORDER

3C FARMS, LLC, an Oregon limited liability
company; EASTERDAY FARMS PRODUCE,
CO., a Washington corporation; 3E
PROPERTIES, a Washington limited
partnership; CODY A. EASTERDAY, an
individual; CUTTER W. EASTERDAY, an
individual; CLAY A. EASTERDAY, an
individual; TRIPLE E FARMS LLC, a
Washington limited liability company; and
DIVERSIFIED FINANCIAL SERVICES,
LLC, a Nebraska limited liability company,

                Third-Party Defendants.

Russell D. Garrett
Daniel L. Steinberg
Christopher K. Dolan
2 Centerpointe Drive, 6th Floor
Lake Oswego, OR 97035

                Attorneys for Plaintiffs and
                Third-Party Defendants

Amy Edwards
Crystal Chase
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

David E. Suchar, admitted Pro Hac Vice
Jonathan E. Septer, admitted Pro Hac Vice
Evan Nelson, admitted Pro Hac Vice
MASLON LLP 3300
Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140

                Attorneys for Defendants and
                Third-Party Plaintiffs

HALLMAN, United States Magistrate Judge:

## INTRODUCTION

Plaintiffs Easterday Dairy, LLC, and Cole Easterday (referred to collectively as the "Easterdays")[1] bring this action against Defendants Fall Line Capital, Canyon Farm, and Canyon Farm II (referred to collectively as "Fall Line"). The Easterdays, through a series of businesses, contracted with Fall Line and its related businesses to purchase and salvage an inoperative mega dairy on Lost Valley Farm (also called the "Farm"). Cody Easterday's 230-million-dollar cattle fraud and the Easterdays' related bankruptcies disrupted the deal. The remaining Easterdays tried to salvage the deal with Fall Line through a Forbearance Agreement. But the deal has gone sour, and now the parties are before this Court to determine their rights and responsibilities under several contracts they agreed to throughout their relationship.

The main agreements controlling the parties' dispute are the Amended Easement, Forbearance Agreement, Deed of Trust, and Controlled Animal Feeding Operations and Animal Waste Management Plan ("CAFO Permit"). This matter comes before the Court on the Easterdays' Motion for Preliminary Injunction, which seeks twenty-three forms of preliminary relief based on two claims: (1) declaring the initial easement termination unlawful and (2) breach of good faith and fair dealing. The Court held an evidentiary hearing and heard oral argument on this motion from October 3 to 4, 2022. Tr., ECF 84–85.

The parties' briefing and evidence show that the Easterdays will likely lose their dairy business without court intervention. To sufficiently reduce the risk of this injury, the Court

---

[1] Unless otherwise noted, "Easterdays" will encompass members of the family, including Cody and Cole Easterday, and the family's businesses, including Easterday Dairy LLC, Easterday Ranches LLC, Easterday Farms LLC, and 3C Farms LLC. Easterday Farms Dairy LLC was the previous name for Easterday Dairy LLC. Tr. 31:12.

would have to grant three forms of relief: (1) reinstate the Amended Easement; (2) provide the Easterdays sufficient time to obtain a live animal permit before the Amended Easement expires on its own terms; and (3) construe the Amended Easement to allow the Easterdays access to all the information and control of farming practices they need to obtain a live animal CAFO permit. The Easterdays have failed to show a likelihood of success on the merits of a claim that will grant them any of these remedies. And they will need all three for a preliminary injunction to fulfill its goal of sufficiently reducing the risk of irreparable harm. Although they have demonstrated serious questions as to the merits of some of their claims, those claims cannot support the relief they need, and neither the balance of equities nor the public interest factors support a preliminary injunction. Thus, the Court DENIES the Easterdays' Motion for Preliminary Injunction.

## BACKGROUND

### I.     Lost Valley Farm

Lost Valley Farm has two parcels. The inoperative dairy is on the Dairy Parcel, and over 6,000 acres of adjacent farmland makes up the Farm Parcel. Tellier Decl. ¶ 2, ECF 53; *see infra* Attachment. A CAFO Permit regulates the entire Farm. This current permit does not allow dairy animals on the property and has strict remediation and management requirements. Easterday Decl. ¶ 2, ECF 22; Tellier Decl. ¶¶ 5–6; Edmonds Decl. ¶ 8, ECF 55. Fall Line owns the Farm Parcel and sold the Dairy Parcel to the Easterdays. Both parties hoped to work together to comply with the existing CAFO Permit and obtain a new live animal CAFO Permit so the Dairy Parcel could become operational.

The Easterdays bought the Dairy Parcel with 16 million dollars of seller financing from Fall Line in early 2019. Edmonds Decl. ¶¶ 10–14A. The Deed of Trust, Real Estate Contract, and

Promissory Note govern this seller-financed Dairy Parcel sale from Fall Line to the Easterdays. Exs. 3-5. The Easterdays, through Easterday Farms LLC, also entered a twenty-year lease of the Farm Parcel from Fall Line, and Fall Line granted the Easterdays an Easement over the Farm Parcel. Easterday Decl. ¶ 8; Ex. 6. The Farm Lease and Easement were central to the Easterdays complying with the CAFO Permit and obtaining a live animal CAFO Permit because the permit regulates the whole Farm. Ex. 1; Easterday Decl. ¶ 9.

Cody Easterday was the primary negotiator for the Easterdays before his indictment, and he signed as Easterday Dairy's representative guaranteeing the Promissory Note and Deed of Trust. Ex. 4 at 8; Ex. 5 at 27.

In October 2019, Cole Easterday also entered a Home Site Lease with Fall Line that had extendable terms through 2038. Ex. 10 at 1. The land was undeveloped, and Cole added residential improvements costing around 493 thousand dollars. Easterday Decl. ¶ 14.

## II.    Forbearance Agreement and Amended Easement

Two years into the relationship, Cody Easterday's 230-million-dollar fraud of Tyson Meats led to bankruptcy of some of the Easterdays' businesses[2] and a series of defaults under the Deed of Trust, Promissory Note, and Farm Lease. Easterday Decl. ¶ 16; Ex. 14 at 16–17. Rather than end the deal, Cole Easterday and his brothers negotiated a Forbearance Agreement and Amended Easement with Fall Line. Through these documents, Fall Line agreed to forebear from exercising its default rights under the Promissory Note and Deed of Trust in exchange for certain concessions from the Easterdays, including Amending the Easement so that it was less

---

[2] Easterday Ranches, Inc. and Easterday Farms, LLC went bankrupt. During that bankruptcy, Cody and Debby Easterday sold their interest in Easterday Dairy to their three sons Cole, Cutter, and Clay. Tellier Decl. ¶ 11; Easterday Decl. ¶ 16. The Easterday sons never owned interests in Easterday Ranches, Inc. or Easterday Farms, LLC. Easterday Decl. ¶ 16.

permanent. Exs. 17, 18. During the bankruptcy, Easterday Farms terminated the twenty-year

farm lease, and Fall Line leased the Farm Parcel to 3C Farms, another Easterday company, for

one year. Tellier Decl. ¶ 10. After these agreements, the main documents controlling the parties'

current relationship are the Forbearance Agreement, Amended Easement, CAFO Permit, and

Deed of Trust. Exs. 1, 5, 17, 18.

## III.    The Farm Lease Ends

After the one-year farm lease ended in late 2021, the Easterdays started having issues

complying with the existing CAFO Permit and trying to obtain a live animal permit. While the

Easterdays bid on a new lease, Fall Line chose to lease the Farm Parcel to a different company,

Walther Farms. Tellier Decl. ¶ 14. At this point, the Easterdays no longer controlled the Farm

Parcel but were still required to comply with the CAFO Permit that covers the entire Farm. Ex. 1

at 1. The permit requires the Easterdays to keep records of every irrigation occurrence's flow

volume and total nitrogen and phosphorus content. Ex. 1 § S4.A.3. But Fall Line and Walther

Farms only provided weekly bulk totals of this information to the Easterdays. Ex. 103 at 3.

Relying on communication from Fall Line also created substantial problems for the Easterdays in

complying with other CAFO Permit requirements, including reporting spills or overapplications,

changes in irrigation design, and soil moisture probe and lysimeter data. Ex. 103 at 1.

The Easterdays also complained of increased nitrate contamination after the change in

Farm Parcel ownership, but the Court cannot find this increase is because of the change in

ownership or management.[3]

---

[3] The Farm has eleven monitoring wells to sample groundwater and track nutrients leaching
through the soil. Data from monitoring wells three, six, eight, and ten reflect a general increase in
nitrate concentrations since February 2022, right after Walther Farms took over the farm lease.
Tr. 312:19–316:16. But three facts disrupt the connection between these increases and Fall

IV.     **The Amended Easement**

Though the Easterdays lost the farm lease, they still had an Amended Easement over the Farm Parcel until June 2022. The Amended Easement states, "the [Farm Parcel] shall be subject to the [CAFO Permit] for the benefit of the [Dairy Parcel]. Accordingly, [Fall Line] grants [the Easterdays] an easement to access and use the [Farm Parcel to] deliver[] and apply[] liquid and solid nutrients generated by the [dairy] and for all other purposes and obligations [under the existing CAFO Permit or a future CAFO Permit]." Ex. 18. During this time, the Oregon Department of Agriculture ("ODA") did not find Fall Line out of compliance with the CAFO Permit, and Fall Line allowed the Easterdays to access the property. Edmonds Decl. ¶¶ 34–35. But Fall Line was not providing the Easterdays with all the information they needed to comply with the CAFO Permit. Ex. 103 at 1.

V.      **Amended Easement Revocation**

Eight months after the one-year farm lease to 3C Farms ended, Fall Line revoked the Amended Easement, ending the Easterdays chance of revitalizing the dairy as planned. Tr. 298:11–12. Fall Line revoked the Amended Easement under its default provision: "[E]ither party shall have all rights and remedies that may exist at law or in equity, including a right to terminate" the easement after a default. Ex. 18 at 3. A default under the Amended Easement

---

Line's new tenant: (1) a well on the Dairy—not Farm—Parcel has been increasing since 2017; (2) monitoring well three, the main well demonstrating the nitrate increase, is on the boundary between the Dairy and Farm Parcels; and (3) well six, the second most important well demonstrating the increase, is up gradient from the Farm Parcel (making it a control well for background concentrations). Tr. 317:17–319:6. Nitrate also takes one to eighteen months to leach into the monitoring wells, and the Easterdays have only collected eight months of data since Fall Line leased to Walther Farms. Tr. 320:6–12. Finally, the entire groundwater management area surrounding Lost Valley Farm has been experiencing an uptick in nitrate levels. Tr. 320:13–17.

includes "[a]n uncured default under the Loan Documents[,]" which are the Forbearance Agreement, Promissory Note, and Deed of Trust. Ex. 18.

The Forbearance Agreement provided the Easterdays with a period to cure the defaults that occurred in the wake of Cody Easterday's fraud and the family's bankruptcies. Ex. 17 at § 3, Ex. A. The cure period lasted until July 2, 2022, or when any new default under the Loan Documents occurred. Ex. 17 §§ 3, 10. The Loan Documents required the Easterdays to maintain property insurance, provide annual financial information, and not materially violate the CAFO Permit. Ex. 5 §§ 3.2, 3.5, 3.6, 4.6, 5.1. One year after the Forbearance Agreement, the Easterdays lost their insurance on the Dairy Parcel and did not obtain new insurance. Edmonds Decl. ¶ 16; Ex. 21 at 2. The Easterdays also failed to provide Fall Line with annual financial information as required by the Loan Documents. Ex. 29 at 6; Edmonds Decl. ¶ 18.

After the Easterdays failed to procure new insurance or provide yearly financial information, Fall Line initiated proceedings to rescind the Amended Easement or declare the parties' rights under the Amended Easement. Easterday Decl. ¶ 25. Fall Line voluntarily dismissed the action because it could not add necessary parties to the litigation. Easterday Decl. ¶ 26. A few months later, Fall Line sent a notice of intent to terminate the Amended Easement to the Easterdays, and in early June 2022, counsel for Fall Line revoked the easement by recording a "Notice and Termination of Amended and Restated Easement" in the State of Oregon. Easterday Decl. ¶ 27, Ex. 14; Edmonds Decl. ¶ 19, Exs. 5–8; Ex. 30.

## VI.    The Process to Obtain a Dairy Permit if Fall Line Had Not Revoked the Easement

The Easterdays originally applied for a live animal CAFO Permit in July 2021, when they still had the farm lease. Tr. 299:5. Cole Easterday testified that before Fall Line revoked the Amended Easement, the Easterdays "were preparing final touches on the permit and to receive it

back from ODA . . . ." Tr. 294:22–23. But the Easterdays admitted that they had seven steps to take before receiving a final live animal permit: (1) finishing the completeness review of their permit application; (2) receiving the draft permit from ODA; (3) submitting comments on the draft permit; (4) ODA incorporating or rejecting those comments; (5) sending the draft permit out for public comment; (6) incorporating or addressing those public comments; and (7) with sufficient agreement on all sides, finally obtaining the permit. Tr. 356:23–359:14. The Easterdays also admitted that Morrow County's state of emergency regarding high nitrate levels in domestic wells and the Lower Umatilla Basin Groundwater Management Area might complicate this process and lead to stricter permit review. Tr. 351:17–352:3, 355:16–356:22. The Easterdays testified they had no firsthand knowledge of exactly how ODA is processing permits in light of these management concerns. Tr. 355:16–356:22.

**VII.    Prior and Related Litigation**

After Fall Line revoked the Amended Easement and the Easterdays' permitting process halted, the Easterdays filed a complaint with the Morrow County Circuit Court, bringing claims against Fall Line related to the termination of the Amended Easement and interference with the CAFO Permit. Tr. 298:11–12; Edwards Decl. ¶ 2, Ex. 1, ECF 57. The Easterdays sought—and obtained—an *ex parte* temporary restraining order ("TRO") that month, reinstating the Amended Easement and providing the Easterdays with immediate access to Fall Line and Walther Farms' information. Ex. 35 at 3–5. On July 1, 2022, Fall Line moved to dissolve the TRO. Edwards Decl. ¶ 6. The state court granted the motion to dissolve on July 6, 2022, and set a hearing for a preliminary injunction on August 25, 2022. Ex. 36 at 2; Edwards Decl. ¶ 7, Ex. 2. The next day, the Easterdays voluntarily dismissed the action without prejudice under Oregon Rule of Civil Procedure 54(A). Ex. 37. The state court subsequently entered a general judgment of dismissal

without prejudice on August 25, 2022, based on the Easterdays' voluntary dismissal notice filed on September 26, 2022.

Fall Line has also filed eviction proceedings in Morrow County Circuit Court against Cole Easterday to remove him from his home on Lost Valley Farm. Ex. 43. These state court eviction proceedings are ongoing and governed by the Home Site Lease. Ex. 43.

## VIII.   This Litigation

One day after voluntarily dismissing the prior state court proceeding, the Easterdays filed this action. Compl., ECF 1. Nearly two months later, the Easterdays filed their Motion for Preliminary Injunction, requesting twenty-three different forms of injunctive relief based on their likelihood to succeed on two claims: (1) declaring the initial easement termination unlawful and (2) breach of good faith and fair dealing. Pls.' Mot. Prelim. Inj. 8–10 ("PI Mot.") 24, ECF 21. The Easterdays argue that without this injunction, they will suffer six different irreparable harms, including never being able to obtain a live animal CAFO. Fall Line responds by asserting several jurisdiction and abstention arguments as well as refuting the merits of the Easterdays' motion. Defs.' Resp. to PI Mot. ("Defs.' Resp."), ECF 54. The Court held a two-day evidentiary hearing followed by oral argument on the motion and provided the parties with an opportunity to submit supplemental briefing after the hearing.

## STANDARDS FOR OBTAINING A PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show four things: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in their favor; and (4) that an

injunction is in the public interest. *Id*. at 20 (rejecting the Ninth Circuit's earlier rule that a "possibility," rather than likelihood, of irreparable harm could be sufficient to justify a preliminary injunction).

The Supreme Court's decision in *Winter* did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Under this test, a hardship balance sharply favoring the plaintiff can overcome serious questions going to the merits when the other two elements of the *Winter* test are met. *Id*. at 1132.

The harm complained of must be both likely and irreparable for a preliminary injunction to be proper. *Winter*, 555 U.S. at 22. Irreparability reflects the cornerstone proposition that this extraordinary remedy is appropriate only when a trial on the merits cannot occur before the injury occurs or remedy the injury through monetary damages or other relief. *Rent-A-Ctr., Inc. v. Canyon Television and Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991) ("[E]conomic injury . . . can be remedied by a damage award."); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1200 (9th Cir. 1980) (preliminary injunction is only to preserve the status quo for trial). Purely economic injuries like loss of revenue or costs are not irreparable injuries. *Rent-A-Ctr.*, 944 F.2d at 603. In contrast, a loss of goodwill, threat of business extinction, and severe environmental harm can be irreparable injuries. Additionally, a "loss of an interest in real property can constitute an irreparable injury." *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988) (loss of orchard through foreclosure was irreparable).

The irreparable injury must be likely, which is more than just speculative. *Winter*, 555 U.S. at 22; *Wild Rockies*, 632 F.3d at 1131. The relief sought must also effectively minimize the risk of injury. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) ("While being

forced into bankruptcy [is an] irreparable harm, [the plaintiff] has not established that the requested injunction would forestall that fate.") (citation omitted). And the requested injunction must be supported by the plaintiff's claims. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (a motion for preliminary injunction "is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted' [after success on the party's claim]. Absent that relationship or nexus, the district court lacks authority to grant the relief requested.") (quoting *De Beers Consol. Mines v. United States,* 325 U.S. 212, 220 (1945)).

The balance of the hardships test involves weighing the injury the plaintiff would face if the injunction is denied against the burden the defendant would face if the injunction is granted. *Winter*, 555 U.S. at 24. The more burdensome the injunction would be on a defendant, the more hesitant a court should be to grant it. *Id.* at 27. A balance of the equities that tips "sharply" in the plaintiff's favor can overcome serious questions going to the merits of the dispute. *Wild Rockies*, 632 F.3d at 1131–32. District courts have discretion when deciding how to balance the equities. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("The assignment of weight to particular harms is a matter for district courts to decide.").

District courts can use many factors to balance the equities, including (1) whether any of the burdens are self-inflicted, *Sierra Club v. Trump*, 929 F.3d 670, 706 (9th Cir. 2019) (not being persuaded by the unrecoverable fees a party was incurring because those fees were "self-inflicted wounds"), (2) the financial effect of the injunction on the parties, *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("[A] court must consider the impact granting or denying . . . a preliminary injunction will have on the respective enterprises." Financial strength "may be pertinent to this inquiry."); and (3) whether the injunction is

mandatory, forcing rather than prohibiting conduct or changing the status quo, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) (injunction requiring a university to promote the plaintiff to head coach and give her a 28,000 dollar raise was analyzed with greater scrutiny); *see also Dep't Parks & Recreation for State of Calif. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) ("Status quo" means the last uncontested status that preceded the pending controversy), and (4) the duration of harm to the respective parties. *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("The balance of hardships will generally tip in plaintiff's favor if the harm plaintiff faces . . . is permanent while the harm defendant faces . . . is temporary.").

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs.*, 752 F.3d at 766. When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be a neutral factor. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009). But if the effect of an injunction reaches beyond the parties, the public interest will be relevant to whether the district court grants the preliminary injunction. *Id.*

"Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).

## DISCUSSION

### I.       Jurisdiction and Abstention

Fall Line raises four abstention arguments under the *Rooker-Feldman*, primary jurisdiction, *Burford* abstention, and Anti-Injunction Act doctrines. The Court finds neither

*Rooker-Feldman* nor primary jurisdiction prevent it from ruling on the merits of the Easterdays'

Motion for Preliminary Injunction. First, *Rooker-Feldman* does not apply because Fall Line has

failed to show the Easterdays are alleging the state court made a legal error. And second, primary

jurisdiction does not apply because Fall Line fails to point to a specific future ODA decision that

would require the Court to stay this case. However, the Court does find the Anti-Injunction Act

bars any injunction or declaration that would disrupt the ongoing Oregon state court eviction

proceedings against Cole Easterday. Because the Anti-Injunction Act applies, the Court declines

to address *Burford* abstention.[4]

### A.      The *Rooker-Feldman* Doctrine

Under the *Rooker-Feldman* doctrine, federal district courts lack subject matter

jurisdiction to exercise appellate review over final state court judgments. *Rooker v. Fidelity Tr.

Co.*, 263 U.S. 413, 415–16 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 482–86

(1983). "*Rooker-Feldman* . . . is a narrow doctrine, confined to cases brought by state-court

losers complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments."

*Lance v. Dennis*, 546 U.S. 459, 464 (2006). "Even if a plaintiff seeks relief from a state court

judgment, such a suit is a forbidden *de facto* appeal only if the plaintiff also alleges a legal error

by the state court." *Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013) (holding *Rooker-

Feldman* did not apply because while the plaintiffs "sought relief designed to remedy injuries

---

[4] Fall Line argues the Court should abstain under *Burford* from deciding any issues in this case related to the eviction proceedings in Morrow County because the Oregon Revised Statutes specifically grant circuit courts of the county where the property sits jurisdiction over eviction proceedings. Defs.' Resp. 26 (citing *Homesales Inc., of Delaware v. Greene*, No. CV 10-3024-CL, 2010 WL 1630469, at *2–3 (D. Or. Mar. 25, 2010). Given this Court's conclusion regarding the Anti Injunction Act, this Court makes no determination on *Burford* abstention for this motion.

suffered from a state court judgment, they did not allege before the court that the state court committed legal error . . . .").

Fall Line argues that the state court dissolution of the Easterdays' prior temporary restraining order ("TRO") bars this Motion for Preliminary Injunction because it seeks almost the same relief under very similar standards. Defs.' Resp. 15. But the Easterdays' motion must challenge a specific legal wrong by the state court to be a de facto appeal. And Fall Line has failed to point to the specific legal wrong the Easterdays' Motion for Preliminary Injunction challenges. While the Easterdays may believe the TRO dissolution was improper, their Motion for Preliminary Injunction is not a challenge to that state court TRO dissolution. Indeed, the state court provided no discussion of the legal grounds for its dissolution, and the state court could have issued a preliminary injunction after dissolving the TRO. Ex. 36 ("The [TRO] is hereby vacated.").

The state court also never entered a final judgment before the Easterdays filed the federal action. Generally, *Rooker-Feldman* does not bar a federal action filed before a state court judgment is entered. *See* Wright, A. Miller & M. Kane, Federal Practice and Procedure ("Wright & Miller") § 4469.2 n.4–5 (2022) (collecting cases holding federal actions filed before state court judgments and while appeals are pending are not barred by *Rooker-Feldman*); *Mothershed v. Justs. of Sup. Ct.*, 410 F.3d 602, 604 (9th Cir. 2005) (stating state proceedings end when state courts finally decide the federal issues). For example, in *Webb as next friend of K. S. v. Smith*, 936 F.3d 808, 816–17 (8th Cir. 2019), the circuit court held the district court erred in applying *Rooker-Feldman* because "[t]he state courts here never issued any judgments; they entered orders in cases that were later *voluntarily dismissed*, which . . . is a decision *without prejudice* and is not an adjudication on the merits. (quotations omitted) (emphasis added).

Similarly, the state court entered a general judgment after the Easterdays filed their federal

Complaint. Ex. 42. And like *Webb*, the state court proceeding ended from a voluntary dismissal

without prejudice. Exs. 37, 42. Finally, the state court had not decided or even considered the

preliminary injunction. Exs. 34–37, 42. Fall Line has failed to show how these facts implicate

*Rooker-Feldman*.[5]

### B.    Primary Jurisdiction

Fall Line argues any order "requiring Defendants to refill all trenches or ditches dug by

Defendants or their tenants on the Defendants' property with clean uncontaminated soil[]"

violates the primary jurisdiction doctrine. Defs.' Resp. 23. Fall Line argues this order would

violate the primary jurisdiction doctrine because it would second guess the ODA's finding that

the trenches are in full compliance. *Id.*

The primary jurisdiction doctrine is a limited doctrine that allows a court to stay or

dismiss a case so an agency can make an initial determination when four elements are present:

"(1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an

administrative body having regulatory authority (3) [under] a statute that subjects an industry or

activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in

administration." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008).

---

[5] *Doe & Assocs. L. Offs. v. Napolitano*, 252 F.3d 1026, 1029 (9th Cir. 2001), which Fall Line relies on, does not alter this analysis. In that case, *Rooker-Feldman* bared jurisdiction because the district court had to "hold that the state court was wrong in order to find in favor of the plaintiff" and the state court interlocutory order at issue was unappealable in state court ending the state decision making process. *Id.* at 1030. Here, the state decision making process was not over when this case began, and the Court does not have to hold the state court TRO dissolution was wrong to grant the preliminary injunction. *Rooker-Feldman* does not apply.

Fall Line has failed to show how this doctrine applies to the agency decisions it argues have already been initially decided.[6] After an agency has made its determination, this doctrine does not apply, and courts apply a strong presumption that agency decisions are usually reviewable based on separation of powers. *Bowen v. Mich. Acad. of Family Physicians*, 476 US 667, 672 (1986). Fall Line has also failed to show why the decision would be so complex and technical to make the primary jurisdiction doctrine apply. *See Clark*, 523 F.3d at 1114 ("[T]he doctrine is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit. Instead, it is to be used only if a claim requires resolution of an issue of first impression, or . . . a particularly complicated [topic] that Congress has committed to a regulatory agency," such that "protection of the . . . regulatory scheme dictates *preliminary* resort to the agency which administers the scheme . . . .") (citations and quotations omitted) (emphasis added).

In a parenthetical clause and footnote, Fall Line also seems to argue that the Court cannot grant any relief related to the permit's reporting, nutrient application, testing, irrigation, and crop sampling requirements. Defs.' Resp. 17. Fall Line seems to argue these forms of relief are impermissible under the primary jurisdiction doctrine because ODA is monitoring the Farm for compliance and has not found the Farm out of compliance. *Id.*

---

[6] The two cases Fall Line cites reinforce this point. *See Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002) (primary jurisdiction "is a *prudential doctrine* under which courts *may*, under appropriate circumstances, determine that the *initial decision making* responsibility should be performed by the relevant agency") (emphases added); *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1075 (9th Cir. 2010) (holding the district court errored when it failed to take judicial notice of an agency decision and "should have at least stayed its decision" under the primary jurisdiction doctrine while the agency appeal was ongoing so that the agency could finish its initial determination of the issue).

But "primary jurisdiction is not a doctrine of futility." *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.* 192 F.3d 778, 786 (8th Cir. 1999) (holding a court could not continue refusing to hear a case because the agency had not brought an initial enforcement action). It is a doctrine granting the court discretion to stay or dismiss its proceedings only in limited circumstances. *See Clark*, 523 F.3d at 1114. This Court will not exercise this discretion here for three reasons: (1) Fall Line explicitly requests we do not dismiss or stay the case on primary jurisdiction grounds, Defs.' Resp. 17 n.2; (2) Fall Line has not suggested when or what specific ODA decision the Court should wait on; and (3) Fall Line has failed to show how a future ODA decision is required for this Court to decide an issue in this case. This case is about the parties' rights and responsibilities under a series of contracts, which in certain ways relate to the CAFO Permit's requirements. Fall Line has failed to show how some non-specific future ODA compliance decision is needed for this Court to decide these issues or how that decision is so complicated that it must be referred to the agency for initial determination to preserve regulatory consistency.

ODA's compliance decisions are relevant evidence related to CAFO Permit compliance, and the Court will consider this evidence. *See Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1075 (9th Cir. 2010) (stating a district court errored by not taking judicial notice of an agency decision). But primary jurisdiction does not prevent the Court from deciding the issues before it.

## C.     The Anti-Injunction Act

The Court finds that it cannot grant any type of injunction or stay of the state court eviction proceeding under the Anti-Injunction Act. Under the Anti-Injunction Act, federal courts "may not grant an injunction to stay proceedings in a State court . . . ." 28 U.S.C. § 2283. The Act applies even when the injunction is directed to a litigant (ordering the litigant not to proceed

further) instead of to the state court proceeding itself. *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970); *Prudential Real Est. Affiliates, Inc. v. PPR Realty, Inc.* 204 F.3d 867, 879 (9th Cir. 2000). The Act also applies to a declaratory judgment if the judgment has the same effect as an injunction. *California v. Randtron*, 284 F.3d 969, 975 (9th Cir. 2002). So long as the state court proceeding is ongoing, the Act applies. *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965) (The Anti-Injunction Act does "not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted."); *Kline v. Burke Const. Co.*, 260 U.S. 226, 232, 235 (1922) (holding the Anti-Injunction Act applies to *in personam* federal cases filed before related state cases); *Barancik v. Invs. Funding Corp. of N.Y.*, 489 F.2d 933, 936 (7th Cir. 1973) (citing *Kline*, 260 U.S. at 226 for the proposition that "[t]he mere fact that the federal complaint was filed before the state proceeding was commenced is not sufficient to avoid the [Anti-Injunction Act's] statutory bar").[7]

---

[7] The Easterdays dispute the Act's application because this case was filed before the state case. *See* Tr. 478:14 (citing *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1217–18 (C.D. Cal. 2002)). The *Cottonwood* case is unpersuasive for three reasons. First, it does not address *Kline,* and instead cites the footnote dicta of a First Circuit case. *Cottonwood*, 218 F. Supp. 2d at 1217 (citing *Wulp v. Corcoran,* 454 F.2d 826, 831 n.5 (1st Cir. 1972)). This First Circuit case's discussion of the Anti-Injunction Act is dicta because no state proceeding was ongoing and the case was about *Younger* abstention. *Wulp*, 454 F.2d at 832 (deciding the question of whether *"Younger* appl[ies] to a case when *no state prosecution is pending*") (emphasis added). Second, when the First Circuit later directly addressed this issue, it clarified that the Anti-Injunction Act does not apply when the federal litigant *moves* for the injunction before the state case is filed. *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 842 n.6 (1st Cir. 1988) (the Act does not apply when "the federal court's injunctive power [was] *invoked* (i.e., requested) . . . before the state court action" was filed). This is very different than the Act not applying when a federal litigant only files the case before the state proceeding is initiated. Third, the *Cottonwood* case is also distinguishable because the state proceeding would have deprived the federal court of jurisdiction to hear Cottonwood's case. 218 F. Supp. 2d at 1217. In contrast, the Easterdays never mentioned the eviction proceedings or the Home Site Lease in their Complaint and only raised these issues in their Preliminary Injunction Motion after Fall Line filed for eviction.

As part of their request for a preliminary injunction, the Easterdays ask the Court to "[p]rohibit[] Fall Line from attempting to evict Cole Easterday from his residence." PI Mot. 10. Fall Line filed the eviction proceeding on August 2, 2022. Edwards Decl. Exs. 8, 9. Thus, the eviction proceeding is ongoing, and the Court will not enjoin it. This includes granting declaratory relief that has the same effect as an injunction, and it applies even if the requested relief is directed at Fall Line instead of the state court.

## II.    Likelihood of Success on the Merits

At the hearing and in their supplemental briefing, the Easterdays focused on two claims to support their Motion for Preliminary Injunction: (1) their fourth claim for declaratory judgment and (2) their first claim for rescission.[8] Am. Compl. ¶¶ 37–43, 54–56, ECF 5. The Easterdays have failed to show that they are likely to succeed on the merits of either claim.  At most, the Easterdays have demonstrated serious questions going to the merits of their claims.

### A.    Declaratory Judgment

In seeking a declaratory judgment, the Easterdays argue that Fall Line unlawfully terminated the Amended Easement. PI Mot. 26. First, they contend that Fall Line unlawfully terminated the easement because it did so extrajudicially. *Id.* at 26–27. Second, the Easterdays argue that the purported basis for the termination was unlawful. Pls.' Suppl. Br. 4–7, ECF 80. In response, Fall Line argues that the termination was not unlawful because the express terms of the Amended Easement allow each party to terminate the easement in the event of a default. Def.

---

[8] When this motion was originally filed, it was difficult to determine exactly which claims serve as the basis for the Easterdays' motion. At the hearing, the Easterdays' counsel clarified that they are not seeking a preliminary injunction on the basis of their slander of title claim, so the Court declines to address this claim further. The Court also declines to separately address the Easterdays' claim for a "permanent injunction," which is a type of relief and not a standalone claim. *Johnson v. Brown*, 567 F. Supp. 3d. 1230, 1236 n.2 (D. Or. 2012).

Resp. 20. It also argues that the Easterdays' defaults under the related documents provided a legal basis for the termination. Def. Supp. Br. 3–10, ECF 86.

### i.    Method of Termination

The Easterdays argue the language of the Amended Easement—specifically, the rights and remedies listed in the document—"require adjudication by a court."[9] PI Mot. 26; Pls.' Reply 9–10, ECF 67. Fall Line argues that the Amended Easement allows either party to terminate the easement unilaterally after a default by the other party. Def. Resp. 21. Essentially, the parties dispute whether the text of the Amended Easement allows Fall Line to exercise extrajudicial remedies. If it does not, then the termination was unlawful.

Whether the easement termination was unlawful is a question of contract interpretation. *See Kell v. Oppenlander*, 154 Or. App. 422, 426 (1998) (applying principles of contract interpretation to an express easement to determine whether an easement was terminated). Looking first at the words of the easement in the context of the entire document, *see Yogman v. Parrot*, 325 Or. 358, 361 (1997), both parties' interpretations of the Amended Easement are reasonable. The Amendment Easement provides:

> Except as otherwise provided in Section 9 below to the contrary, in the event of default under this Agreement, either party shall have all rights and remedies that may exist at law or in equity, including a right to terminate this Agreement, seek specific performance, or the right to recover damages for a default under this Agreement, which remedies shall not be exclusive, but shall be cumulative and in addition to every other remedy now or hereafter existing at law or equity.

Ex. 18 ¶ 5.

---

[9] The Easterdays also argue that an easement can only be terminated in specific ways. Though the Easterdays' cases demonstrate that an easement *can* be terminated by consent, prescription, abandonment, or merger, these cases do not state that these are the *only* mechanisms by which an easement ends. *See* PI Mot. 27; Pls.' Suppl. Br. 7. Moreover, the Easterdays agreed to the termination provisions by signing the Amended Easement.

The Easterdays point out the Amended Easement has limiting language. Specifically, it provides that either party "shall have all rights and remedies that may exist at law or in equity, *including* the right to terminate this Agreement." Pl. Supp. Br. 8; Ex. 18 ¶ 5. According to Black's Law Dictionary, legal and equitable remedies are remedies historically available in courts of law or equity. "Remedy," Black's Law Dictionary (11th ed. 2019). And by using the word "including" before the right to terminate, the text suggests that termination of the agreement is an example of legal and equitable remedies. "Include," Black's Law Dictionary (11th ed. 2019) ("The participle *including* typically indicates a partial list.").

On the other hand, the right of termination is "a remedy involving the end of contractual relations, accorded to a party to a contract when the other party breaches a duty that arises under the contract." "Right of Termination," Black's Law Dictionary (11th ed. 2019). Further, as Fall Line points out, the Amended Easement uses expansive language, specifically stating that the remedies listed—including the right to termination—"shall not be exclusive, but shall be cumulative and in addition to every other remedy now or hereafter existing at law or equity." Ex. 18 ¶ 5. This language suggests that the parties may have intended that self-help remedies be available in addition to the judicial remedies that a party could seek. Thus, it is ambiguous whether extrajudicial termination is permitted under the Amended Easement.

Because the contract is ambiguous, the Court may consider extrinsic evidence of the parties' intent. *Yogman*, 325 Or. at 363; *Kell*, 154 Or. App. at 426. The Easterdays have cited no extrinsic evidence, except highlighting that both the original and Amended Easement have the same termination language and that Fall Line initiated a lawsuit prior to resorting to self-help. By contrast, Fall Line has cited evidence in support of its position. The letter of intent signed by Cody Easterday at the outset of the parties' relationship provided that any manure easement

"shall remain terminable by the lender and/or owner of the farmland in the event of any loan default beyond the applicable cure period." Ex. 3 at 7. And a month before signing the Amended Easement, counsel for Fall Line emailed the Easterdays' counsel that the language in the Amended Easement would work for Fall Line "as long as we are clear that the easement may be terminated unilaterally upon an uncured event of cross-default." Ex. 13 at 2. Counsel for the Easterdays responded by confirming that the termination clause "expressly gives Grantor the right to terminate in the event of default." *Id.* at 1. Taken together, this extrinsic evidence demonstrates that the parties' intent likely was to allow one party—Fall Line—to terminate the easement unilaterally in the event of the other's default. Accordingly, the Easterdays have, at best, demonstrated serious questions on their claim that Fall Line's unilateral termination of the Amended Easement was unlawful.[10]

## ii.    Default Under the Amended Easement

The Easterdays also argue that there are no unexcused material defaults that justify Fall Line's termination of the Amended Easement. Pls.' Suppl. Br. 4. They argue the Court should excuse their lack of casualty insurance under the doctrine of supervening impossibility. *Id.* Fall Line argues that the Easterdays were in default under the Amended Easement because of multiple cross-defaults under the Deed of Trust and Forbearance Agreement, triggering Fall Line's right to terminate under the express terms of the Amended Easement. Defs.' Suppl. Br. 4. The Court agrees with Fall Line.

---

[10] The Court also notes that even if Fall Line's termination of the Amended Easement was unlawful, the Easement could be terminated earlier by this Court based on the defaults discussed in the following section. Thus, as discussed in the Irreparable Harm section, even if the Easterdays were to succeed on this claim, it would not provide a basis for the preliminary relief they seek or sufficiently reduce the risk of the irreparable harm they allege.

As a threshold matter, The Court disagrees with the Easterdays' argument that only a material breach can justify the termination of a contract. Under the Forbearance Agreement, the parties contracted for the right to terminate after *any* default. The terms of that agreement control the parties' rights and obligations. *See, e.g.*, *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 643 (1995) ("[I]f a written contract between the parties expressly allows for a particular remedy by one of the parties, . . . the parties' objectively 'reasonable expectations' under the contract include the invocation of that remedy in the face of [a] breach.").

The Easterdays have failed to show they were not in default under the Loan Documents, so Fall Line has a legal basis for termination of the Amended Easement. It is undisputed that the Easterdays failed to obtain insurance in 2022, after they signed the Forbearance Agreement. Ex. 21. This requirement was included in the underlying contracts and triggered a default under the Deed of Trust. Ex. 5 §§ 3.2, 6.1. And the Amended Easement provides that a default under the Deed of Trust results in a cross-default under the Amended Easement, triggering the right to terminate. Ex. 18 ¶ 5 ("[I]n the event of default under this Agreement, either party shall have . . . a right to terminate this Agreement . . . . An uncured default under the Dairy Loan Documents . . . shall constitute a default under this Agreement."). Fall Line testified that this was a basis for the termination of the Amended Easement. *See also* Ex. 28. Thus, the Easterdays cannot dispute that they were in default.

While Fall Line is not required to demonstrate that the insurance breach was material, the Easterdays have also conceded the materiality of this default. The Easterdays only argument on this issue is that this breach should be excused by impossibility of performance. Under Oregon law, a party may be excused from performance if a supervening event makes performance impossible. *Savage v. Peter Kiewit Sons' Co*., 249 Or. 147, 152 (1967). "Supervening

impossibility occurs 'where, after the formation of a contract facts that a promisor had no reason

to anticipate, and for the occurrence of which he is not contributing fault, render performance of

the contract impossible[.]'" *Id.* (quoting Restatement (First) Contracts § 457 (1932)).

"[U]nexpected difficulties and expense do not excuse performance of a contract unless so

extreme that a practical impossibility exists and resulting in hardship so extreme as to be outside

any reasonable contemplation of the parties." *Sachs v. Precision Prod. Co.*, 257 Or. 273, 281–82

(1970). "A mere showing of commercial unprofitability, without more, will not excuse the

performance of a contract." *Savage*, 249 Or. at 153.

The Easterdays have not demonstrated that they experienced anything more than some

additional difficulty or expense in trying to obtain insurance because the dairy was inoperable.

And this difficulty was well within the reasonable expectations of the parties as the dairy was

inoperable when they signed the Forbearance Agreement. The Easterdays argue that their failure

to obtain insurance was caused wholly by third-party insurers and Fall Line's interference with

the Easterdays' ability to obtain a live animal CAFO Permit.[11] Pls.' Suppl. Br. 5; Tr. 433:14–20

(arguing that they could not obtain insurance because they were an inoperable dairy). The

Easterdays characterize this as "a circumstance wholly unexpected by the parties" that "could

[not] have been guarded against." Pls.' Suppl. Br. 6. But the evidence shows that even as an

inoperable dairy without a live animal CAFO, the Easterdays had maintained insurance on the

dairy until the end of 2021. Thus, the dairy's inoperable status was not a "wholly unexpected"

---

[11] The Easterdays offered only vague testimony as to the steps they took to obtain insurance, including talking to insurance brokers to bid out policies that never came to fruition. Tr. 156:9–12 ("I recall receiving bids from insurance, but later not being able to get them because of the insurance company was—didn't want to go down certain paths with us or, you know, any reason that insurance companies have."); Ex. 126 (email from Tellier indicating he was unable to find insurance). Fall Line, by contrast, provided testimony that it was eventually able to obtain casualty insurance on the Dairy Parcel for $260,000 per year. Tr. 389:15–19.

event that made obtaining insurance impossible. The Easterdays' failure to obtain insurance was a material default not excused by impossibility.

Fall Line only needed one default to terminate, but the Easterdays also failed to provide required financial documents to Fall Line. This was a default under the Deed of Trust. Ex. 5 § 3.6. And these defaults occurred after the Easterdays signed the Forbearance Agreement. The Easterdays argue they were not disclosing this information because Fall Line had previously provided information to the Easterdays' debtors. Tr. 434:17–435:5. But because the Easterdays failed to point to a non-disclosure provision in the agreement or a legal authority providing this as an excuse for compliance, the Court cannot find that these prior disclosures excuse the Easterdays' performance of this contract term.[12] Moreover, this default was material given the significant concerns regarding the financial health of Easterday Dairy following Cody's fraud and the Easterdays' related bankruptcies.

Given these defaults, which are both material and specifically included in the Forbearance Agreement, the Easterdays have failed to demonstrate they are likely to succeed on the merits of their claim seeking a declaration that the termination of the Amended Easement is void.

### B.      Rescission

The Easterdays argue that they are entitled to rescission of the Amended Easement. Pls.' Suppl. Br. 8. The basis for this claim for equitable relief appears to be Fall Line's "wrongful actions" that are alleged to have been taken in bad faith and in violation of the covenant of good faith and fair dealing under the Loan Documents, Amended Easement, and Forbearance

---

[12] Given that any default, much less a material default, was sufficient to terminate the amended easement, the Court does not consider the remaining defaults asserted by Fall Line.

Agreement. PI Mot. 26–30; Pls.' Suppl. Br. 8–9; Tr. 448:10–18. In their analyses, the Easterdays

focus on two sets of facts. First, they argue that the defaults Fall Line cites as a basis for the

foreclosure are "neither material nor accurate." PI Mot. 28. Second, the Easterdays emphasize

that Fall Line has hampered their ability to comply with the existing CAFO and obtain a future

live animal permit by, among other things, leasing the Farm Parcel to Walther Farms, refusing to

provide information as required by the easements, and restricting the Easterdays' access to the

Farm Parcel. *Id.* at 28–30; Pls.' Suppl. Br. 8–9.

In response, Fall Line argues that a party cannot violate the duty of good faith and fair

dealing by exercising their contractual rights. Defs.' Resp. 24. It also argues that the Easterdays

are impermissibly seeking to use the duty of good faith and fair dealing to change express

contractual terms agreed upon by the parties with regard to the obligations under the Amended

Easement and existing CAFO Permit. *Id.* at 26–27.

"Rescission is a potential remedy" for breach of contract. *Venture Props., Inc. v. Parker*,

223 Or. App. 321, 349 (2008). To rescind a contract, a breach must be "substantial." *Bollenback

v. Continental Cas. Co.*, 243 Or. 498, 506 (1966). The party seeking rescission must also

establish their claim by clear and convincing evidence. *Venture Props*, 223 Or. App. at 349.

Oregon courts recognize an implied contractual duty of good faith and fair dealing.

*See Best v. U.S. Nat'l Bank. of Or.*, 303 Or. 557, 561 (1987). The contractual good faith doctrine

is designed to "effectuate the reasonable contractual expectations of the parties." *Id.* at 563; *see

also Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010) (the

implied duty of good faith and fair dealing "serves to effectuate the objectively reasonable

expectations of the parties"). "[S]o long as it is not inconsistent with the express terms of the

contract, the duty of good faith is a contractual term that is implied by law into *every*

contract." *Eggiman v. Mid-Century Ins. Co.*, 134 Or. App. 381, 386 (1995) (quotations omitted). The duty "does not operate in a vacuum[;]" rather, it "focuses on the agreed common purpose and the justified expectations of the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract." *Or. Univ. Sys. v. Or. Pub. Emp. Union*, 185 Or. App. 506, 515–16 (2002) (quotations omitted). Because the duty cannot contradict an express contractual term, it "'may be implied as to a disputed issue *only* if the parties have not agreed to an express term that governs that issue.'" *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1033 (D. Or. 2012) (quoting *Or. Univ. Sys.*, 185 Or. App. at 511) (emphasis in *Arnett*).

Even assuming a breach of the duty of good faith and fair dealing for a group of contracts can support a claim for rescission of one particular contract, the Easterdays have not met their burden in demonstrating that they are likely to succeed on the merits of this claim. The Easterdays' argue Fall Line has breached this duty by terminating the Amended Easement. This claim for breach of good faith and fair dealing fails. "[A] party never violates the duty of good faith and fair dealing by 'invoking its express, written contractual wright.'" *W. Prop. Holdings, LLC v. Aequitas Cap. Mgmt.*, 284 Or. App. 316, 325 (2017) (quoting *Uptown Heights*, 320 Or. at 645). And "[t]he duty of good faith and fair dealing . . . does [not] provide a remedy for an unpleasantly motivated act that is permitted expressly by contract." *Stevens v. Foren*, 154 Or. App. 52, 58 (1998).

The Easterdays were in default, and the Easterdays agreed to Fall Line having the right to terminate the Amended Easement in the event of a default. Ex. 18. The termination of the Amended Easement and exclusion of the Easterdays from the Farm Parcel cannot support a violation of good faith and fair dealing because Fall Line was exercising its contractual right. *See*

*Uptown Heights*, 320 Or. at 643 ("[I]f a written contract between the parties expressly allows for a particular remedy . . . [after] a specified breach, . . . [t]he party invoking [that] express, written contractual right does not . . . violate its duty of good faith.").

The Easterdays' second argument—specifically, that Fall Line's actions have hampered the Easterdays' ability to comply with the existing CAFO Permit and obtain a future live animal permit—presents a closer call because one purpose of the parties' business arrangement was to help the Easterdays obtain a new permit for an operable dairy. But the Easterdays have still failed to show they are likely to succeed on their claim for rescission, which requires proof by clear and convincing evidence of a substantial breach. Success on this claim would require the Court to find that the duty of good faith and fair dealing required Fall Line—and its tenant Walther Farms—to provide documents and information to the Easterdays. The Easterdays, however, have not shown why the existing agreements impose this obligation on Fall Line or Walther Farms. Nor have the Easterdays explained how the Court could read such a substantial term into the parties' contracts when the contracts expressly state that the Easterdays had the burden of performing all obligations under the CAFO Permit, *see* Ex. 5 § 4.6 (under the terms of the Deed of Trust, the Easterdays "will not directly or indirectly cause, allow or otherwise permit a material violation to occur under the Permit Documents and will remain in compliance, in all material respects, with the Permit Documents."), and the Amended Easement by its terms only provided the Easterdays an "an easement to access and use the [Farm Parcel] for the purpose of delivering and applying liquid and solid nutrients generated by the CAFO and for all other purposes and obligations to which the Burdened Property may be subject" under the CAFO, Ex. 18 ¶¶ 1, 6, 7. In other words, the Easterdays have not demonstrated such an arrangement was within the reasonable expectations of the parties.

Further, the record does not support the Easterdays' allegation that Fall Line and Walther Farms have implemented questionable farming practices in violation of the existing CAFO. And the evidence does not suggest that Fall Line took any of these steps—including failing to renew the farm lease or leasing the Farm Parcel to Walther Farms—in bad faith. Rather, Fall Line's witnesses explained that this was a simple business decision. In the shadow of Cody Easterday's fraud and Easterday Farms' bankruptcy, Fall Line provided the Easterdays with an opportunity to continue their working relationship under the Forbearance Agreement and leased the Easterdays the Farm Parcel for an additional year. To protect itself, the Amended Easement and Forbearance Agreement included one-sided provisions benefitting Fall Line. Ultimately, Fall Line became concerned about the Easterdays' solvency and opted for a safer and more lucrative business opportunity in leasing the Farm Parcel to a third party.

In light of this evidence, the Easterdays have not met their burden in showing they are likely to succeed on their claim for rescission and breach of the duty of good faith and fair dealing. While the events that have transpired between the parties over the last two years have undoubtedly made the Easterdays' ability to obtain a future live animal permit unlikely, the Easterdays have failed to demonstrate that Fall Line's exercise of its contractual rights and following actions have violated the duty of good faith and fair dealing such that rescission of the Amended Easement would be appropriate here.  At most, Fall Line has demonstrated serious questions as to the merits of this claim.[13]

---

[13] This claim is particularly important to the Easterdays' Motion for Preliminary Injunction because, as described below, the Amended Easement expires by its own terms on December 31, 2022. Ex. 18. If the Easterdays cannot obtain recission of the Amended Easement, then any relief that this Court could grant with respect to the Amended Easement would last only through the end of the year.

### C.        Conclusion

For the foregoing reasons, the Easterdays have not shown a likelihood of success on the merits, which is the "most important" factor. *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). Because this is a threshold issue, if a plaintiff fails to show a likelihood of success, the court generally need not consider the other three *Winter* elements. *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015). However, the Court will continue its analysis because the Easterdays have raised serious questions as to the merits of Fall Line's ability to unilaterally revoke the Amended Easement and its breach of the duty of good faith and fair dealing. *Wild Rockies*, 632 F.3d at 1134–35 ("A preliminary injunction is appropriate when a plaintiff" raises "serious questions going to the merits . . . and the balance of hardships tips sharply in the plaintiff's favor.") (alterations omitted).

## III.    Likelihood of Irreparable Harm

Without court intervention, the Easterdays will not obtain a live animal CAFO permit, ruining their current business plan. To prevent this harm, the Easterdays request a preliminary injunction that reinstates and broadly construes the Amended Easement, giving the Easterdays control over Fall Line's farming practices, data, and reporting information. However, the Easterdays' claims do not support the relief they would need to obtain a live animal permit. And any relief this Court could grant would not reduce the risk of the Easterdays' irreparable harms. Accordingly, the Easterdays cannot succeed on this *Winter* factor.

### A.        The harms facing the Easterdays are both likely and irreparable.

The Easterdays argue Fall Line's conduct will irreparably harm their business in six ways: (1) loss of revenue; (2) decommissioning costs; (3) foreclosure and losing the Dairy Parcel; (4) nitrate contamination of the Farm's groundwater; (5) CAFO Permit termination and civil or criminal penalties for violating the existing CAFO Permit; and (6) never obtaining a live

animal dairy. PI Mot. 21–26. Fall Line disputes that many of these harms are likely, imminent, and irreparable.[14] But overall it is undisputed that absent Court intervention, it is unlikely that the Easterdays will ever obtain a live animal CAFO permit and be able to maintain a functioning dairy. *See* Tr. 479:1–8 (Fall Line's statement that it is "unlikely" that the Easterdays will get a CAFO permit absent some court intervention).[15] Thus, the harm to the Easterdays is irreparable for two reasons: (1) they will lose an interest in real property that's value is too hard to quantify or remediate through a damages award, *Sundance Land*, 840 F.2d at 661 (holding loss of interest in unique real property was irreparable because a damages award would be inadequate); and (2) the Easterdays' entire business plan depends on obtaining a live animal CAFO Permit, *see, e.g.*, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (occurrences that "will disrupt and change the whole nature of [a] business" are irreparable).

---

[14] Loss of revenue and decommissioning costs are not irreparable because "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr.*, 944 F.2d at 603. Similarly, civil penalties are not irreparable. *Chiafalo v. Inslee*, 224 F. Supp. 3d 1140, 1147 (W.D. Wash. 2016) (citing *Rent-A-Ctr.*, 944 F.2d at 603 for the proposition that civil penalties are not irreparable because they can be cured through a damages award).

[15] Although this overall harm is likely, the Court is not convinced that it will likely occur before trial, which Plaintiffs must also demonstrate. *See Winter*, 555 U.S. at 22 (likelihood standard); *L.A. Mem'l Coliseum*, 634 F.2d at 1200 (preliminary injunction is only to preserve the status quo for trial). Specifically, there is no possibility that the Easterdays will lose the Dairy Parcel to foreclosure in advance of trial, as judicial foreclosure is a claim in this proceeding. Answer ¶¶ 189–209; Tr. 469:4–13. The Easterdays have also not presented sufficient evidence of imminent and irreparable groundwater contamination. *Supra* Note 3. Finally, the Easterdays only presented evidence that they could not comply with the permit's specific terms; they did not provide evidence showing ODA was imminently likely to revoke the permit or impose civil or criminal penalties. This Court need not resolve this issue, however, given its conclusion that any relief this Court could grant, before or after trial, would not be sufficient to prevent these harms.

**B.      If the Easterdays succeed on their claims, the limited relief that this Court could grant would not prevent any irreparable harm.**

Although the harm facing the Easterdays is both likely and irreparable, their proposed remedies far exceed any relief this Court could grant. And the limited relief this Court could grant on the Easterdays' claims would not prevent the ultimate harm. Thus, the Easterdays' proposed relief is untethered to their specific claims, and they cannot succeed on this *Winter* factor.

A preliminary injunction should "grant relief of the same character as" a favorable merits determination on the underlying claim. *Pac. Radiation Oncology, LLC*, 810 F.3d at 636. And in deciding whether to grant a preliminary injunction, the Court must determine whether the requested injunction will effectively minimize the risk of these injuries. *See Perfect 10, Inc.*, 653 F.3d at 981 ("While being forced into bankruptcy [is an] irreparable harm, [the plaintiff] has not established that the requested injunction would forestall that fate.") (citation omitted). Here, the Easterdays seek an injunction reinstating the easement and broadly construing it to (1) require Fall Line to comply with the existing CAFO Permit by providing detailed farm reports, including information about water and fertilizer applications, damage and repairs to irrigation and nutrient systems, spills of nutrients or water, crop yields, and crop samples for protein analysis; (2) allow the Easterdays to control Fall Line's fertilizer management on the Farm Parcel; and (3) prohibit Fall Line from "improperly" managing irrigation on the property. PI Mot. 9–10.

While the Court acknowledges the requested injunction may prevent the harm alleged here, the requested injunction is beyond the scope of the Easterdays' claims, which narrowly relate to the Amended Easement. Specifically, success on the declaratory relief claim would likely not reinstate the easement when the Court finds sufficient defaults to terminate the

agreement by court order now. And if the court granted declaratory relief in the form of reinstating the Amended Easement, it would only support reinstatement of the Amended Easement until December 2022, when it expires by its terms.

Similarly, the Easterdays have failed to show their breach of good faith and fair dealing claim can lead to the rescission or reformation of the Amended Easement's expiration date. The connection between this claim and the relief sought is especially tenuous for three reasons: (1) the claim seeks rescission of a particular time limitation in one contract based on a breach of good faith and fair dealing of multiple contracts entered into over years, *Bodenhamer v. Patterson*, 278 Or. 367, 376 (Or. 1977) ("When a contract is rescinded the parties should be restored, as nearly as possible, to their situations prior to the transaction."); (2) it would force these parties to continue a long-term business relationship after this contentious litigation; and (3) the Easterdays have failed to address the other requirements for rescission, like prompt notice of intent to rescind, *Id.* at 374–375; *Mount Joseph Cattle Co. v. Makin Farms, Inc.,* 180 Or. App. 27, 35 (2002) (citing *Powell v. Goff,* 126 Or. App. 194, 199 (1994)). The Easterdays have failed to show how success on their claims supports the long-term reinstatement of the easement.

But even if the easement was reinstated, the Easterdays have not explained how the easement would allow them anything more than access to the Farm Parcel. The easement states that the Farm Parcel is subject to the CAFO permit and the Easterdays will have access to the Farm Parcel for permit compliance purposes. The Easterdays provided little argument and no evidence supporting their broad construction of the easement's terms. Without more, the Court finds it unlikely that the easement would grant the Easterdays access to all the information, records, and control of farming operations they need for permit compliance. Nor would it support an injunction allowing the Easterdays to dictate how Fall Line manages its farm. In other words,

the relief sought is not of the same character as the Easterdays' claims, and the Easterdays have

not met their burden of demonstrating how any of their other claims would support a preliminary

injunction of this nature.

Conversely, the relief that the Easterdays could obtain were they to succeed on the merits

of their claims would not effectively minimize the irreparable injury the Easterdays seek to

forestall. Again, success on the Easterdays' claim of declaratory relief could only entitle them to

reinstatement of the Amended Easement through its expiration in December 2022. The evidence

shows that the Easterdays cannot obtain a live animal permit by the end of the year, and the

Easterdays did not dispute this at oral argument. Thus, an injunction based on their declaratory

claim could not prevent the loss of their easement and, with it, their business as planned. Forcing

Fall Line to abide by the Amended Easement until the end of the year will not "forestall [the

Easterdays'] fate." *Perfect 10, Inc.*, 653 F.3d at 982.

The Court similarly finds that success on the Easterdays' rescission claim would not

sufficiently reduce the risk of harm alleged here—significant disruption of their business due to

an inability to obtain a live animal permit. The Easterdays could not comply with the existing

CAFO Permit, much less obtain a live animal permit, after they lost the farm lease and while the

Amended Easement was intact. *See supra* Background § III. Reinstating the easement without an

expansive construction will not sufficiently reduce the risk of the Easterdays' alleged harms. *See*

*Garcia*, 786 F.3d at 744 (finding difficulty with the plaintiff's claim of irreparable harm where

there was "a mismatch between her substantive copyright claim and the dangers she hopes to

remedy through an injunction").

At its core, this case is about the significant disruption in the business relationship

between the Easterdays and Fall Line caused by Cody Easterday's criminal conduct—most

notably, the loss of the farm lease and control over the Farm Parcel. Despite their efforts to salvage their relationship, the Easterdays face the loss of their CAFO Permit as planned because of the events of the last year and a half. Without control over the Farm Parcel, the Easterdays cannot comply with the existing CAFO and will likely never get their live animal permit. But their claims involving the manure easement do not provide an adequate basis for the Court to undo years of contracts and business decisions. Thus, the Easterdays have failed to show that there is irreparable harm that this Court could remedy even if they succeed on their claims.

**IV.    Balance of the Equities**

The Easterdays argue the injunction only returns the parties to the position they were before the unilateral revocation of the easement while denying it causes the Easterdays the irreparable harm previously described. PI Mot. 32. Accordingly, the Easterdays argue this injunction should only impose significant additional costs on Fall Line if they are not managing the property in line with the CAFO Permit and applicable easement. *Id*. at 32–33. Fall Line argues the injunction would strip it of its bargained contract rights under the Amended Easement, Deed of Trust, and Home Site Lease. Defs.' Resp. 37–38. Fall Line also argues that an injunction would force it to reveal its tenant's proprietary information about irrigation and fertilizer use and give the Easterdays too much control over its farming operations, leading to lost revenue. *Id*. Fall Line argues these burdens outweigh the minor injury of maintaining the status quo of an inactive dairy on the property if the injunction is denied. *Id*.

The Court is sympathetic to the hardship the Easterdays face, which includes the potential loss of their dairy business. However, those hardships were self-inflicted by Cody Easterday's 230-million-dollar fraud and the agreements they willingly entered after. Thus, the Court will not be balancing the equities sharply in their favor. And while Fall Line is likely in a better position

to absorb the financial effect of an injunction, the Court is mindful that the broad relief sought by the Easterdays is mandatory, requiring Fall Line to provide information about and control over its farming practices for an indefinite period. For these reasons, the Court does not find the balance of the equities tips sharply in favor of the Easterdays.

## V.      Public Interest

The Easterdays argue the injunction will protect groundwater from nutrient runoff by requiring Fall Line and related parties to comply with the CAFO permit. Pls.' Reply 12. For the reasons previously discussed, the Court does not find Fall Line and its new tenant's actions are leading to a groundwater environmental hazard. *See supra* Note 3. The Easterdays' requested injunction would also affect Walther Farms, a third party, by forcing them to divulge proprietary nutrient input information. Thus, the injunction is not in favor of the public interest.

## CONCLUSION

The Easterdays' Motion for Preliminary Injunction [21] is DENIED.

IT IS SO ORDERED.

DATED this 22nd day of November, 2022.

_____
ANDREW HALLMAN
United States Magistrate Judge

**ATTACHMENT**

Lost Valley Farm: Dairy Parcel in red, Farm Parcel in yellow:

